IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOSE MANUEL VILLALOBOS MEDINA, and ANTHONY JOEL MAYNOR, *aka* "*Ant*,"<br><br>Defendants. | Cause No. CR 20-41-GF-BMM<br><br><br>**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS** |

The Government charges Defendant Jose Manuel Villalobos Medina (Medina) with possession with intent to distribute methamphetamine, heroin, and fentanyl, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Doc. 1 at 1−2. Medina filed a Motion to Suppress. Doc. 29. He asserts that (1) law enforcement lacked probable cause either to investigate him or to stop the vehicle in which he

1

was a passenger, (2) law enforcement lacked reasonable suspicion to search him, and (3) as a consequence, the evidence found in his hotel room must be dismissed as fruit of the poisonous tree. Doc. 29 at 0-1. The Government opposes the Motion. Doc. 42. The Court held a hearing on September 9, 2020. Doc. 44.

## BACKGROUND

Medina checked into the Comfort Inn Suites in Great Falls, Montana, on March 17, 2020. Doc. 42 at 3. He provided an Arizona driver's license and paid for his room with cash. *Id*. He informed the hotel clerk that he was an electrician coming to Great Falls for work. *Id*. The hotel clerk subsequently notified law enforcement that, in the clerk's view, a suspicious Hispanic man had checked in and matched the profile of another previous guest at the hotel who had been arrested for distributing narcotics. *Id*. at 3−4.

The hotel clerk explained to law enforcement that he considered the guest suspicious because he appeared quite nervous, paid for his room with cash, and although he claimed to be an electrician, had not arrived in a work vehicle, and did not possess any tools. *Id*. at 3. Officers sought to corroborate the clerk's suspicions. They rented the room directly across from Medina's room and set up surveillance—apparently monitoring the hallway and Medina's closed door through the peephole in their own door. *Id*. at 4.

Medina departed the hotel using a ride-share service shortly after officers set

up surveillance. *Id*. Detective Hunt followed Medina as he traveled to the parking lot of Jaker's off 10th Avenue South. Doc. 42-1 at 12. Detective Hunt watched Medina exit the ride share, use his cell phone, and immediately walk away from the restaurant toward a dark-colored sedan waiting across the parking lot. Doc. 42 at 4. Medina got into the back seat of the sedan with two people in the front seat. The sedan left Jaker's and drove a few blocks down 10th Avenue South to the Target parking lot. Doc. 42-1 at 12. The sedan parked in a secluded area of the parking lot far from the store and other parked cars. *Id*.

Detective Hunt testified that he suspected illegal drug activity was transpiring and requested that a patrol car make contact with the people in the sedan. *Id*. Officers Supalla and Larson arrived as the sedan drove away from the parking lot. Doc. 42 at 5. Officer Supalla observed the sedan make a right-hand turn without signaling an intent to turn at least 100 feet beforehand, in violation of Mont. Code. Ann. § 61-8-336(2). *Id*. Officer Supalla also observed a cracked windshield that impeded the driver's view, in violation of Mont. Code. Ann. § 61-9-405(b)(2). *Id*. Officers Supalla and Larson then stopped the sedan. *Id*.

Officer Larson approached the sedan and observed the passenger in the front seat (later identified as Anthony Maynor) attempt to shove something into his pocket. Doc. 42-1 at 1. Officer Larson instructed Maynor to keep his hands out of his pockets. *Id*. Maynor continued to attempt to hide something in the center

3

console.  Officer Larson ordered Maynor out of the vehicle.  *Id*.

Officer Larson physically removed Maynor from the vehicle when Maynor hesitated.  *Id*.  In the process, Officer Larson observed a methamphetamine pipe in the front seat.  *Id*.  Officer Larson arrested Maynor for tampering with evidence.  *Id*.  Officer Supalla arrested the driver (later identified as Eli Mason Williams) for violating the conditions of his probation.  Doc. 42.

Meanwhile, Detective Hunt arrived at the scene.  Doc. 42-1 at 12.  Detective Hunt removed Medina from the back seat, handcuffed him, and placed him in the patrol car.  Doc. 42 at 6.  Detective Hunt conducted a brief pat down of Medina and found an Arizona driver's license, two cell phones, a hotel key, and several hundred dollars in cash and pre-paid credit cards.  Doc. 42-1 at 12.  Detective Hunt briefly questioned Medina, while officers transported Williams and Maynor to the Cascade County Detention Center.  *Id*.  Medina told Detective Hunt that he was an electrician in Great Falls for work and that he had met Williams and Maynor to buy marijuana.  *Id*.

Officers searched Maynor at the Cascade County Detention Center and found large quantities of methamphetamine, heroin, and oxycodone hidden in his underwear.  Doc. 42 at 6.  Around the same time, officers transported Medina to the Great Falls police station pending the outcome of the narcotics investigation.  *Id*. at 7.  Officers conducted a more thorough search of Medina at the Great Falls

police station and located $6,700.00 in cash hidden in his underwear.  Doc. 42-1 at 8.

Detective Hunt applied for and received a search warrant for Medina's hotel room.  *Id*. at 7.  In executing the warrant that same day, law enforcement discovered in Medina's hotel room over 1,000 grams of methamphetamine, over 500 grams of heroin, over 100 grams of fentanyl, and various items of paraphernalia indicative of drug dealing.  Doc. 42 at 8.  The Government charged Medina with possession with intent to distribute methamphetamine, heroin, and fentanyl, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.  Doc. 1 at 1−2.

## ANALYSIS

I.     *Investigation and Surveillance.*

No actions taken by the officers from the time the hotel clerk notified law enforcement about Medina until Officers Supalla and Larson stopped the sedan in which Medina rode as a passenger implicated the Fourth Amendment.  Parties do not contest the relevant facts.  The hotel clerk notified law enforcement that a suspicious man had rented a room.  Doc. 42 at 3.  Law enforcement responded, interviewed the hotel clerk, and set out to corroborate the clerk's suspicion by surveilling Medina's movements.  *Id*. at 4.

Medina possesses no expectation of privacy in the hallway outside his hotel room, nor does he maintain any expectation of privacy in the hotel parking lot or

on public streets. *Katz v. United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public… is not a subject of Fourth Amendment protection."). No interaction between law enforcement and Medina took place until the traffic stop that would implicate the Fourth Amendment.

Detective Hunt never conducted an investigatory stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). Detective Hunt did not search Medina's person, houses, papers, or effect. Officers simply asked the hotel clerk some questions, rented their own hotel room, and watched Medina in public spaces. The Fourth Amendment protects persons from unreasonable searches and seizures. It does not prohibit law enforcement from conducting reasonable investigations in public spaces. *See*, *Katz*, 389 U.S. 347, 351 (1967).

## II.     *Traffic Stop*

Medina argues that law enforcement illegally used a traffic violation as a pretext to stop the vehicle and conduct a narcotics investigation. Doc. 29. The United States Supreme Court was clear in *Whren v. United States*: pretextual traffic stops do not violate of the Fourth Amendment when officers have probable cause to believe the person has violated the traffic code. 517 U.S. 806, 819 (1996). The actual motivation proves largely irrelevant. Instead, to have effectuated a stop, Officers Supalla and Larson needed only to have probable cause that Williams had violated the traffic code. *Id*.

The parties do not contest the relevant facts. After following Medina from the hotel, Detective Hunt suspected Medina of drug activities and requested a patrol car to make contact with Medina while he was parked in the Target parking lot. Doc. 42-1 at 12. Officers Larson and Supalla responded shortly afterwards and began following Medina. *Id*. Officer Supalla observed the sedan turn right without signaling an intent to turn at least 100 feet beforehand, in violation of Mont. Code. Ann. § 61-8-336(2). *Id*. at 5−6. Officer Supalla also observed a cracked windshield that impeded the driver's vision, in violation of Mont. Code. Ann. § 61-9-405(b)(2). *Id*. Under *Whren*, these two traffic infractions provide sufficient probable cause to warrant a traffic stop. 517 U.S. 806, 819 (1996).

### III.      *Illegal Drug Investigation*

A traffic violation gives officers probable cause to conduct a traffic stop under *Whren*. *Id*. A traffic stop does not give officers free reign to investigate for as long, or as broadly, as they wish. *See*, *Rodriguez v. United States*, 575 U.S. 348, 348−49 (2015). A court evaluates the "tolerable duration" of a traffic stop by the seizure's mission. *Id*. Authority for the seizure ends "when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id*.

Officers can prolong or broaden an investigation if they develop independent reasonable suspicion that something more sinister appears afoot than a mere traffic violation. *United States v. Evans*, 786 F.3d 779, 789 (9th Cir. 2015). The Ninth

Circuit recognized that "an officer may prolong a traffic stop if the prolongation itself is supported by independent reasonable suspicion." *Id*. Therefore, even though the scope of the original stop was to investigate a traffic violation, once Officer Larson located the methamphetamine pipe in the sedan, the law permitted officers to broaden the initial traffic stop to investigate possible narcotic activities. *Id*.

Law enforcement detained Medina as part of that investigation into illegal drug activities. Officers needed only a reasonable suspicion that Medina was involved in criminal activity in order to detain Medina. *Terry v. Ohio*, 392 U.S. 1, 27 (1964). Officers had ample evidence to suspect that Medina was involved in criminal activity. They knew Medina paid for his hotel in cash. Doc. 42-1 at 12. He took a ride share to a restaurant. He did not enter the restaurant, but instead immediately left with two other people for a brief rendezvous in a secluded part of a nearby parking lot, far from the storefronts and other parked cars. *Id*.

Moments into the stop, Officers Larson and Supalla testified that they observed the passengers acting nervously. Maynor began to fidget in his seat in an apparent attempt to conceal an item from the officers. Officer Larson identified this item as a methamphetamine pipe. This evidence, taken as a whole, proves sufficient to provide officers with reasonable grounds to detain Medina for a reasonable amount of time to investigate his potential involvement in criminal

8

activity. *Terry*, 392 U.S. 1, 27 (1964).

Detective Hunt conducted a brief and preliminary search once he detained Medina. This brief search yielded an Arizona driver's license, two cell phones, a hotel key, and nearly $400.00 in cash and prepaid credit cards. Officers, consistent with *Terry v. Ohio*, are permitted to conduct brief and preliminary pat downs in search of identification and weapons. *Id*. at 30−31. Given the circumstances, including the presence of the methamphetamine pipe in the sedan and Maynor's refusal to comply with instructions, Detective Hunt had reasonable grounds to conduct a brief, preliminary search of Medina's person, pursuant to *Terry v. Ohio*. *Id*. As a consequence, this Court finds no grounds to suppress the evidence found on Medina's person.

## IV. *Interrogating Medina.*

Detective Hunt testified that he handcuffed Medina, placed him in the patrol car, and asked him several questions. Those questions were substantively the following: (1) what is your name; (2) what are you doing in Great Falls; and (3) how do you know Maynor and Williams. Medina told Detective Hunt his name, that he was in Great Falls for work, and that he had met with Maynor and Williams to buy marijuana. Doc. 42-1 at 12.

The Fifth and Fourteenth Amendments require police officers to inform persons of certain constitutional rights before conducting custodial interrogations.

*Miranda v. Arizona*, 384 U.S. 436 (1966). Those rights include the right to remain silent and the right to have an attorney present for custodial interrogation. *Id*. at 444. Officers must provide *Miranda* warnings to all persons before conducting custodial interrogations. *Id*. Custodial interrogations occur whenever officers ask interrogatory questions of a person in police custody.

To determine whether a person is in custody and whether a question is interrogatory can prove difficult at times. The Government conceded at oral argument that (1) Medina was in police custody during Detective Hunt's questioning, and (2) Detective Hunt never provide him with *Miranda* warnings. The Government argues instead that the questions were not interrogatory questions, but were appropriate background questions that do not require *Miranda* warnings.

Interrogatory questions involve "any words or actions on the part of police that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Pennsylvania v. Muniz*, 496, U.S. 582, 600−01 (1990). This analysis "focuses upon the perceptions of the suspect, rather than the intent of the police." *Id*. at 601. In *Muniz*, officers asked the defendant for his name, address, height, weight, eye color, date of birth, and current age. The officers then asked him "what the date was of your sixth birthday?" *Id*.

The United States Supreme Court concluded that officers should have

10

known that, from Muniz's perspective, each of these questions were reasonably likely to elicit an incriminating response. *Id*. at 600−01. The Supreme Court suppressed only the sixth-birthday question, however, because the other questions fell under the "routine booking question" exception. *Id*. at 601. This exception allows officers to ask a person for "biological data necessary to complete booking or pretrial services" without first providing *Miranda* warnings. *Id*. at 601.

Detective Hunt should have known that all his questions were "reasonably likely to elicit an incriminating response." *See*, *Id*. 600−01. The United States Supreme Court explicitly determined that asking a person to provide his or her name constitutes an interrogatory question that requires *Miranda* warnings. *Id*. Asking Medina how he knows Maynor and Williams likewise qualifies as an interrogatory question. Officers reasonably would expect an incriminating response when they ask a person to explain his or her connection with two companions who were just arrested for having committed crimes.

Detective Hunt's questions do not fall under the "routine booking question" exception outlined in *Muniz*. *Id*. This exception applies only to questions "requested for record-keeping purposes only" and reasonably relate to administrative concerns. *Id*. at 601−602. Detective Hunt's did not pose his questions for record-keeping purposes. Detective Hunt posed these questions to Medina in the middle of an ongoing illegal drug investigation without having first

11

provided Medina with *Miranda* warnings.

Medina was in custody when Detective Hunt asked him interrogatory questions. *Miranda* required Detective Hunt to provide warnings to Medina before interviewing him. Detective Hunt's failure to provide *Miranda* warnings to Medina before asking interrogatory questions violated *Miranda v. Arizona*, 384 U.S. 436 (1966). Medina's responses must be suppressed.

### V. *Transporting Medina.*

Officers transported Medina to the Great Falls Police Department shortly after Detective Hunt's questioning. Doc 42-1 at 12. Medina argues that officers detained him for longer than necessary to investigate him for the misdemeanor offense to which he confessed—the purchase of marijuana from Maynor and Williams. Medina argues that officers knew his name, birthday, driver's license number, and where to find him, and they had very little evidence connecting him to other illegal activity. The Government conceded that it could not determine whether officers transported Medina to the Great Falls Police Department before or after officers at the Cascade County Detention Center had reported back that they had found illegal drugs in Maynor's underwear. This uncertainty suggests that officers did not rely on the information in deciding whether to transport Medina to the Great Falls Police Department.

The Fourth Amendment allows police to stop a person if they have

reasonable suspicion that the person is involved in criminal activity. *Terry v. Ohio*, 392 U.S. 1 (1968). A stop must last no longer than is necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 500 (1983). Officers had probable cause to stop the sedan to investigate a traffic violation. *See*, *United States v. Whren*, 517 U.S. 806, 819 (1996). They developed reasonable suspicion to expand the traffic violation investigation into an illegal drug investigation when Officer Larson found the methamphetamine pipe in the Sedan. *United States v. Evans*, 786 F.3d 779, 789 (9th Cir. 2015).

Officers could detain Medina no longer than necessary to conduct an illegal drug investigation. *Florida v. Royer*, 460 U.S. 491, 500 (1983). At a minimum, they could detain Medina while they arrested and searched Williams and Maynor and while they searched the sedan. It proves less clear whether the decision to transport Medina to the Great Falls Police Department reasonably related to the illegal drug investigation. Medina claims that officers should have issued him a citation for the marijuana misdemeanor and released him. He argues that the evidence discovered at the Great Falls Police Department must be suppressed because officers unlawfully extended his detention by transporting Medina.

This Court needs not determine whether the transportation of Medina to the Great Falls Police Department constituted excessive detainment. The evidence discovered when officers searched Medina at the Great Falls Police Department

13

inevitably would have been discovered. *See*, *Nix v. Williams*, 467 U.S. 431 (1984). Officers were entitled to detain Medina for a reasonable amount of time to conduct an illegal drug investigation. *Florida v. Royer*, 460 U.S. 491, 500 (1983). As such, officers could have held Medina at the scene until officers finished searching the sedan and processing Maynor.

Officers at the Cascade County Detention Center processed Maynor minutes after Maynor was taken from the scene. They quickly would have found the drugs hidden on his person. Officers at that point would have possessed sufficient probable cause to arrest Medina for possible illegal drug activity. Officers knew that Medina had paid cash for his hotel room. They knew that he had taken a ride-share to meet Maynor and Williams. The three traveled in the sedan to a secluded area of a different parking lot, where they met for only a brief time. Officers found a methamphetamine pipe in the car, several hundred dollars of wadded up cash and prepaid credits cards on Medina, and the drugs hidden on Maynor. These facts, when taken together, provide probable cause to arrest Medina. Officers inevitably would have found the large sum of cash hidden in his underwear when they processed Medina into custody. The evidence found on Medina at the Great Falls Police Department need not be suppressed. *Nix*, 467 U.S. at 445.

**VI.**     ***Search Warrant.***

Medina does not attack the sufficiency of the evidence presented in the

14

search warrant application. He argues only that the evidence in the search warrant application stems from illegal police activity, and thus evidence found pursuant to the warrant must be suppressed as fruit of the poisonous tree. *See*, *Silverthorne Lumber Co. V. United States*, 152 U.S. 385 (1920). As explained above, however, this Court finds that neither the initial investigation, nor the subsequent stop and search of Medina at the scene and at the Great Falls Police Department, violated his Fourth Amendment rights. Only Medina's statements made in response to Detective Hunt's questioning at the sedan needs to be suppressed. Even without Medina's responses, the search warrant application (Doc. 42-2) still proves sufficient on its face to establish probable cause of potential illegal drug activity. The fruits of its execution need not be suppressed.

## ORDER

Accordingly, **IT IS HEREBY ORDERED** that Medina's Motion to Suppress (Doc. 29) is **DENIED** in part and **GRANTED** in part.

Detective Hunt subjected Medina to a custodial interrogation without first providing *Miranda* warnings. As a result, the Court suppresses Medina's responses to Detective Hunt's questioning. Medina's Motion to Suppress (Doc. 29) as it relates to Medina's responses to Detective Hunt's questioning is **GRANTED**.

Medina's Motion to Suppress (Doc. 29) as it relates to physical evidence

15

found on Medina's person and in Medina's hotel room is **DENIED**.

DATED this 24 day of September, 2020.

_____
Brian Morris, Chief District Judge
United States District Court